**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| LKQ CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| ROBERT RUTLEDGE, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

NOW COMES Plaintiff, LKQ Corporation (also "LKQ"), by and through its attorneys, FISHER PHILLIPS LLP, and for its Complaint for Injunctive Relief and Monetary Damages states as follows:

## NATURE OF THE ACTION

1.     LKQ brings this action against Defendant Robert Rutledge (also "Rutledge") for violating his restricted stock unit and restrictive covenant agreements with LKQ.  LKQ formerly employed Rutledge in a senior management role as a Plant Manager.  Rutledge's promises to abide by certain restrictive covenants entered into with LKQ were a material inducement in exchange for the Company's promises to grant him substantial restricted stock from 2011 to 2020.  Indeed, Rutledge profited handsomely from this arrangement.  Immediately after voluntarily resigning his employment with LKQ, however, Rutledge accepted substantially similar and competitive employment with a direct competitor in contravention of his contractual obligations to LKQ.  Through this action, LKQ seek damages to compensate it for Rutledge's conduct in violation of his contractual agreements with LKQ, the forfeiture and recoupment of restricted stock unit grants that were expressly conditioned on Rutledge's fidelity to his restrictive covenant agreements with

1

LKQ, and injunctive relief to prevent Rutledge from engaging in further conduct in violation of his legal obligations to LKQ.

## THE PARTIES

2.      Plaintiff LKQ Corporation was, at all relevant times, and is a Delaware corporation with its principal place of business at 500 W. Madison Street, Suite 2800, Chicago, Illinois.

3.      Defendant Rutledge resides in Lake City, Florida, and is and was a resident of the State of Florida during the period of 2013 to present.

## JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over Rutledge because he consented to the jurisdiction of this Court under the terms of multiple Restricted Stock Unit Agreements and Restrictive Covenant Agreements that are at issue in this case.

5.      Alternatively, the Court has personal jurisdiction over Rutledge because he entered into various contracts with LKQ that were drafted, negotiated, and performed, in part, at LKQ's principal place of business in Chicago, Illinois.  The unlawful conduct at issue in this case was (1) intentional; (2) expressly aimed at and directed to LKQ in the forum state of Illinois; and (3) Rutledge was aware that his injurious effects would be felt in the forum state of Illinois.

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs.  Because LKQ (Illinois, Delaware) is a citizen of a different state than Rutledge (Florida), there is complete diversity of citizenship.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claim substantially arises out of incidents or events occurring in this judicial district.  In the alternative,

FP 40691524.1

venue is proper because Rutledge consented to litigation in this Federal court in the Restricted Stock Unit Agreements and Restrictive Covenant Agreements at issue in this litigation.

## FACTUAL ALLEGATIONS

A.  **Background Regarding LKQ**

8.  LKQ is, among other things, a national supplier of salvage and aftermarket automobile parts and products to mechanical shops, repair shops, and other customers.

9.  LKQ invests significant time, money, and marketing resources in building its brand in the marketplace, investing in hiring, marketing, advertising, and product and technology development, and fostering long-term customer relationships.

10.  LKQ has accumulated key customer contact information and information relating to business needs and service requirements necessary to develop long-term customer relationships.

11.  Through these efforts, LKQ has developed a strong reputation in the marketplace and engendered substantial goodwill with its customers.

12.  LKQ conducts business throughout the United States and sells salvage and aftermarket automobile products to customers through its facilities in most states across the country. LKQ operates both full-service and self-service facilities throughout the nation to distribute its parts and serve its customers. As of December 31, 2020, LKQ operated out of approximately 525 facilities across the United States.

B.  **Background Regarding Rutledge's Employment with LKQ**

13.  On or about October of 2009, Rutledge began his employment with LKQ.

14.  Prior to his employment with LKQ, Rutledge worked for a predecessor entity, Greenleaf, LLC. The business conducted at the facility where Rutledge worked was acquired by LKQ as part of an acquisition with Greenleaf, LLC.

15.     During his employment with LKQ, Rutledge worked in the capacity of Plant Manager at LKQ's facility located at 4686 East U.S. Highway 90, Lake City, Florida 32055 ("the Lake City Facility").

16.     Rutledge's duties as a Plant Manager included day-to-day operational and financial management relating to LKQ's business and customers.

17.     As a Plant Manager, Rutledge had direct control and responsibility for recruiting and hiring staff, managing staff, employee safety, business development, marketing, sales, and client account services.

18.     Rutledge also had profit and loss responsibility and specific revenue, sales, and profitability goals.  Rutledge was also responsible for annual business planning, strategic planning, and business forecasting.

19.     Rutledge's duties as a Plant Manager also included managing and participating in sales to prospective and existing customers, interacting with customers, implementing marketing and sales initiatives and promotions, developing and maintaining relationships with customers, and managing customer retention.

20.     Rutledge's ability to develop and maintain key customer relationships was critical to LKQ's efforts to drive sales and retention.

21.     During the course of his employment, Rutledge received training and/or instruction relating to LKQ's marketing, sales, and technical processes, techniques, and methodologies.  This included, among other things, training and instruction relating to the development and management of customer relationships, sales and marketing plans, servicing LKQ's customers, the technical support of LKQ's sales and product initiatives, and contractual agreements with customers.

22.     In his capacity as a Plant Manager, Rutledge had access to LKQ's customer information, customer requirements, pricing information for customers, historical product sales, sales plans and proposals, financial performance, margins, and agreements relating to customer product sales, and similar non-public information.

23.     This information has substantial commercial and competitive value because it is not generally known to or readily ascertainable through proper means by competitors who can obtain economic value from this information.

24.     LKQ takes reasonable measures to protect its confidential business and trade secret information, including, but not limited to, requiring passwords to be used to access Company computer systems and records, and having policies that expressly prohibit the use, removal, and disclosure of such information outside the Company.

**C.     Rutledge and LKQ Enter Into Restricted Stock Unit Agreements in 2013-2020.**

25.     Commensurate with his job duties in a senior management position, LKQ paid Rutledge a six-figure salary, bonuses, and other compensation.  Prior to voluntarily resigning his employment, Rutledge's gross annualized compensation often exceeded $200,000.

26.     Beginning in 2011, and in consideration of his substantial responsibility in a senior manager position, LKQ designated Rutledge a "Key Person" and made him eligible for substantial grants of LKQ stock in accordance with LKQ's equity compensation incentive plan.

27.     In each of 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, and 2020, LKQ and Rutledge entered into a separate "Restricted Stock Unit Agreement" providing Rutledge with the right to exercise shares of LKQ stock pursuant to the terms, conditions, and vesting schedules set forth in the respective agreements.  *See* True and Correct Copies of LKQ and Rutledge's 2013, 2014, 2015, 2016, 2017, 2018, 2019, and 2020 Restricted Stock Unit Agreements, attached hereto

at Exhibits A – H (referred to collectively as the "RSU Agreements" and individually as the "2013 RSU Agreement," "2014 RSU Agreement," *etc.*).

28.     As a a material inducement for LKQ to enter into these agreements and provide Rutledge with substantial equity compensation, Rutledge agreed to the following restrictive covenants ending nine months after Rutledge's separation of employment with LKQ (referred to collectively as the "RSU Restrictive Covenants").

29.     Pursuant to the 2013, 2014, and 2015 RSU Agreements, Rutledge agreed to the following non-competition, non-solicitation, and confidentiality covenants:

> 16.     <u>Non-Competition and Confidentiality</u>…
>
> (a)(i)  the Key Person shall not directly or indirectly (1) be employed by, engage or have any interest in any business which is or becomes competitive with the Company or its subsidiaries or is or becomes otherwise prejudicial to or in conflict with the interests of the Company or its subsidiaries, (2) induce any customer of the Company or its subsidiaries to patronize such competitive business or otherwise request or advise any such customer to withdraw, curtail or cancel any of its business with the Company or its subsidiaries, or (3) solicit for employment any person employed by the Company or its subsidiaries; provided, however, that this restriction shall not prevent the Key Person from acquiring and holding up to two percent of the outstanding shares of capital stock of any corporation which is or becomes competitive with the Company or is or becomes otherwise prejudicial to or in conflict with the interests of the Company if such shares are available to the general public on a national securities exchange or in the over-the-counter market; and
>
> (ii)  the Key Person shall not use or disclose, except for the sole benefit of or with the written consent of the Company, any confidential information relating to the business, processes or products of the Company.

*See* 2013, 2014, and 2015 RSU Agreements, Section16, Exhibits A-C.

30.     Pursuant to the 2016, 2017, 2018, 2019, and 2020 RSU Agreements, Rutledge agreed to the following non-competition, non-solicitation, and confidentiality covenants:

17.    <u>Non-Competition and Confidentiality</u>…

(a)(i)    the Key Person shall not directly or indirectly (1) be employed by, engage or have any interest in any business which is or becomes competitive with the Company or its Subsidiaries or is or becomes otherwise prejudicial to or in conflict with the interests of the Company or its Subsidiaries, (2) induce any customer of the Company or its Subsidiaries to patronize such competitive business or otherwise request or advise any such customer to withdraw, curtail or cancel any of its business with the Company or its Subsidiaries or (3) hire or solicit for employment any person employed by the Company or its Subsidiaries or hire any person who was employed by the Company or its Subsidiaries at any time within nine months of such hire; provided, however, that this restriction shall not prevent the Key Person from acquiring and holding up to two percent of the outstanding shares of capital stock of any corporation which is or becomes competitive with the Company or is or becomes otherwise prejudicial to or in conflict with the interests of the Company if such shares are available to the general public on a national securities exchange or in the over-the-counter market; and

(ii)    the Key Person shall not use or disclose, except for the sole benefit of or with the written consent of the Company, any confidential information relating to the business, processes or products of the Company. Nothing in this Agreement, however, prohibits the Key Employee from reporting violations of law or regulation to any U.S. federal, state or local governmental or law enforcement branch, agency or entity (collectively, a "Governmental Entity"), or from cooperating with any Governmental Entity, including the EEOC, the Securities and Exchange Commission or the Department of Justice.

*See* 2016, 2017, 2018, 2019, and 2020 RSU Agreements, Section 17, Exhibits D-H.

31.    Under the terms of the RSU Agreements, LKQ and Rutledge also agreed that, if the

"Key Person" is not compliance with the restrictive covenants set forth in the respective RSU

Agreements for a period of nine months following Rutledge's separation of employment, then

Rutledge agreed to forfeit his restricted stock and related proceeds as set forth below:

…the RSUs, the shares of common stock of the Company underlying the RSUs, or any proceeds received by the Key Person upon the sale of shares of common stock of the Company underlying

> the RSUs shall be forfeited by the Key Person to the Company without any consideration therefore, if the Key Person is not in compliance, at any time during the period commencing on the date of this Agreement and ending nine months following the termination of the Key Person's affiliation with the Company and/or its subsidiaries…

*See* 2013-2015 RSU Agreements, Section 16, Exhibits A-C.

> …the RSUs, the Shares underlying the RSUs and any proceeds received by the Key Person upon the sale of Shares underlying the RSUs shall be forfeited by the Key Person to the Company without any consideration therefore, if the Key Person is not in compliance, at any time during the period commencing on the Grant Date and ending nine months following the Key Person's Separation from Service…

*See* 2016-2020 RSU Agreements, Section 17, Exhibits D-H.

32.    Further, the parties agreed to the following provisions governing the forfeiture and/or repayment of the restricted stock units under the RSU Agreements as follows:

> The forfeiture shall be effective as of the date of the occurrence of any of the activities set forth in 16(a) above. If the shares of common stock of the Company underlying the RSUs have been sold, the Key Person shall promptly pay to the Company the amount of the proceeds from such sale.

*See* 2013-2015 RSU Agreements, Section 16, Exhibits A-C.

> The forfeiture shall be effective as of the date of the occurrence of any of the activities set forth in Section 17(a) above. If the Shares underlying the RSUs have been sold, the Key Person shall promptly pay to the Company the amount of the proceeds from such sale.

*See* 2016-2020 RSU Agreements, Section 17, Exhibits D-H.

33.    In addition, the parties agreed that LKQ "shall be" entitled to injunctive relief for any violation of the RSU Restrictive Covenants in Section 16 of the 2013-2015 RSU Agreements and the RSU Restrictive Covenants in Section 17 of the 2016-2020 RSU Agreements.  *See* 2013-

2015 RSU Agreements, Section 16, Exhibits A-C; 2016-2020 RSU Agreements, Section 17, Exhibits D-H.

34.     Section 20 of the 2016-2020 RSU Agreements further expound upon LKQ's right to clawback, cancel, and recoup any and all amounts received by Rutledge under LKQ's equity incentive plan and in accordance with any applicable law.  *See* 2016-2020 RSU Agreements, Section 20, Exhibits D-H.

35.     LKQ and Rutledge further agreed that: "any and all actions concerning any dispute arising hereunder shall be filed and maintained only in a state or federal court sitting in the County of Cook, State of Illinois.  The parties hereto specifically consent and submit to the jurisdiction of such court."  *See*, 2016-2020 RSU Agreements, Section 15, Exhibits D-H.

36.     Rutledge reviewed, assented to, and accepted each of the 2013-2020 RSU Agreements.  Rutledge's acceptance was manifested using his unique login identification and user password.  LKQ's equity management software, Certent, shows the specific date and time that Rutledge accepted each grant and the corresponding contractual documents accepted within the grant package.

37.     The parties' acceptance of the respective RSU Agreements was also manifested based on their performance under the RSU Agreements, including the vesting and granting of restricted stock units to Rutledge, which were subsequently exercised and sold by Rutledge, in accordance with the terms and conditions of the respective RSU Agreements.

38.     To date, Rutledge has received $317,507.02 worth of LKQ stock arising out of the vesting and release of restricted stock grants provided during the period of 2011-2020.  This includes a total of 11,414 of vested LKQ shares during this time period.

**D.     Rutledge's Confidentiality, Non-Competition, and Non-Solicitation Agreements**

FP 40691524.1

39.     In consideration of LKQ's agreement to issue him restricted stock under the RSU Agreements and his continued employment and other compensation as a Plant Manager, Rutledge also entered into various Confidentiality, Non-Competition, and Non-Solicitation Agreements with LKQ during the period of 2011 through 2020.  *See* True and Correct Copies of the 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, and 2020 Confidentiality, Non-Competition, and Non-Solicitation Agreements, attached hereto at Exhibits I-R (referred to collectively as the "Restrictive Covenant Agreements").

40.     Rutledge reviewed, assented to, and accepted the 2011 and 2012 Restrictive Covenant Agreements by physically signing each of these agreements.  *See* 2011 and 2012 Restrictive Covenant Agreements, Exhibits I-J.

41.     Rutledge reviewed, assented to, and accepted the 2013-2020 Restrictive Covenant Agreements. Rutledge's acceptance of each of the 2013-2020 Restrictive Covenant Agreements was manifested using his unique login identification and user password.  *See* 2013-2020 Restrictive Covenant Agreements, Exhibits K-R.

42.     The language in the Restrictive Covenant Agreements referenced below is the same for each of the respective 2011-2020 Restrictive Covenant Agreements.

43.     Pursuant to the language in the Restrictive Covenant Agreements: "Employee desires to receive a grant of an equity incentive award from Employer under the Employer's 1998 Equity Incentive Plan…"  *See* Restrictive Covenants Agreements, pp. 1, Exhibits I-R.  "NOW THEREFORE, in consideration of the grant of the equity incentive award to Employee as of the date of this Agreement and in consideration of Employee's employment by and with Employer or one of its subsidiaries (this Agreement being a condition of such award grant and employment),

Employer and Employee agree to the following conditions..." set forth in the Restrictive Covenant Agreements. *Id.*

44.     In other words, the granting of restricted stock by LKQ was also conditioned on Rutledge's agreement to be bound by the separate promises contained in the Restrictive Covenant Agreements.

45.     Under the terms of each of the Restrictive Covenant Agreements, Rutledge agreed to and entered into a Non-Competition covenant ("Non-Competition Covenant"). *Id.*  Pursuant to this covenant:

> 2.     <u>Non-Competition</u>. Employee agrees that Employee shall not, directly or indirectly, either for Employee or for any other person or entity, during Employee's employment with Employer and for a period of nine months following the termination of Employee's employment with Employer (i) by Employee for any reason, or (ii) by Employer for cause, engage in, represent, furnish consulting services to, be employed by or have any interest in (whether as owner, principal, director, officer, partner, agent, consultant, lender, shareholder, member or otherwise) any business that would be competitive with any business conducted by Employer or its subsidiaries on the date of this Agreement or any other business conducted by Employer or its subsidiaries during Employee's employment, anywhere within a 75 mile radius of any facility of Employer or its subsidiaries at which Employee worked or over which Employee exercised managerial control while employed by Employer; ***provided, however, that the post-termination restrictions of this Section 2 shall not apply in any jurisdiction in which such restrictions are invalid or unenforceable under applicable law then in effect;*** provided further, however, Employee may acquire and hold an aggregate of up to two percent of the outstanding shares of any corporation engaged in any such business if such shares are publicly traded in an established securities market. Notwithstanding the foregoing, the period of time following termination of employment during which the restrictions set forth herein apply shall be extended for the period of time (if any) that Employee is in violation of restrictions set forth herein.

*See* Restrictive Covenant Agreements, Section 2, Exhibits I-R (bold and italics in original).

46.     Also under the terms of the Restrictive Covenant Agreements, Rutledge entered into a Non-Solicitation covenant ("Non-Solicitation Covenant"). *Id.* Pursuant to this covenant:

> 3.    <u>Non-Solicitation</u>. Employee agrees that Employee shall not, directly or indirectly, either for Employee or for any other person or entity, during Employee's employment with Employer and for a period of nine months following the termination (for any reason) of Employee's employment with Employer, induce any customer of Employer or its subsidiaries to patronize any other business, request or advise any other person or entity with which the Employer has a business relationship (including customers and suppliers) to withdraw, curtail or cancel any of its business with Employer or its subsidiaries, or hire or solicit for employment, or assist any other person or entity in hiring or soliciting for employment, any person employed by any of Employer or its subsidiaries. Notwithstanding the foregoing, the period of time following termination of employment during which the restrictions set forth herein apply shall be extended for the period of time (if any) that Employee is in violation of restrictions set forth herein.

*See Id.*, Section 3.

47.     Under each of the Restrictive Covenant Agreements, the parties agreed that, in the event a provision is found to be unenforceable or invalid, a court shall have the power to reduce the duration and/or area of any restrictive covenant contained therein or delete or sever a provision to render the agreement enforceable as follows:

> If any provision of this Agreement, as applied to any party or to any circumstances, is adjusted by a court to be invalid or unenforceable, the same shall in no way affect any other provision or any other part of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement. If any such provision, or any part thereof, is held to be unenforceable because of the duration of such provision or the area covered thereby, the parties agree that the court making such determination shall have the power to reduce the duration and/or area of such provision, and/or to delete specific words or phrases, and in its reduced form such provision shall then be enforceable.

*See Id.*, Section 5.

FP 40691524.1

48.     Also under the terms of the Restrictive Covenant Agreements, LKQ and Rutledge agreed that, "[a]ny and all actions concerning any dispute arising hereunder shall be filed and maintained only in a state or federal court sitting in the County of Cook, State of Illinois.  The parties specifically consent and submit to the jurisdiction of such court." *See Id.*, Section 8.

49.     The Restrictive Covenant Agreements provide that the non-breaching party shall be entitled to injunctive relief in addition to monetary damages sustained as a result of each breach. *See Id.*, Section 6.

50.     The above covenants are reasonable in scope and duration and are necessary to protect LKQ's legitimate business interests in their confidential information, goodwill, and customer and employee relationships, among other interests.

**E.**     **Rutledge Engages in Conduct in Violation of His Contractual Obligations to LKQ.**

51.     On April 14, 2021, Rutledge voluntarily resigned his employment with LKQ.

52.     Immediately after Rutledge's employment with LKQ ended, LKQ learned that Rutledge had begun a new position with Fenix Auto Parts, Inc. ("Fenix Auto Parts").

53.     Fenix Auto Parts is a national recycler and reseller of original equipment manufacturer and salvage automotive products.

54.     Fenix Auto Parts is a direct competitor of LKQ, including in the automotive marketplace in Lake City, Florida, the region of Northern Florida, and throughout the United States.  Indeed, Fenix Auto Parts is one of LKQ's largest competitors in the salvage automotive product marketplace in the eastern and southeastern United States.

55.     Rutledge is currently employed as a Vice President for Fenix Parts.

56.     Rutledge is engaged in managerial, sales, and marketing activities on behalf of Fenix Auto Parts that are substantially similar to the activities that he performed as a Plant Manager

for LKQ relating to the sales and distribution of products that are directly competitive with those that he serviced and sold on behalf of LKQ.

57.     Fenix Auto Parts operates a facility at 12270 New Kings Road, Jacksonville, Florida 32219, which is within a 75-mile radius of LKQ's Lake City Facility.

58.     Upon information and belief, Rutledge currently resides at 5434 Southwest CR 240, Lake City, Florida 32024, which is within a 75-mile radius of LKQ's Lake City Facility.

59.     Upon information and belief, Rutledge is performing services for Fenix Auto Parts at its corporate headquarters in Texas, from his residence in Lake City, Florida, and at and for the benefit of Fenix Auto Parts' facility located in Jacksonville, Florida.

60.     Upon information and belief, Rutledge has disclosed, or inevitably will disclose in performing his job duties on behalf of LKQ's direct competitor, LKQ's confidential and proprietary business information, including, but not limited to, information relating to customer contracts, contacts, pricing, financial information and gross margins, and customer-related data, to unlawfully compete with LKQ in violation of his contractual obligations to LKQ.

61.     Upon learning of Rutledge's conduct in violation of his restrictive covenant agreements and obligations to LKQ, LKQ provided Rutledge with written notice that his conduct was in violation of the RSU Agreements.

62.     Rutledge's violations of his restrictive covenant agreements and obligations to LKQ are irreparably harming the Company's legitimate business interests, including its customer and employee relationships, good will, and confidential information, among other interests.

63.     Despite his knowledge of his contractual obligations to LKQ, Rutledge's violations of his contractual promises to LKQ and resultant harm are ongoing and demonstrate Rutledge's intent to continue his misconduct unabated.

14

## COUNT I
### (Breach of Contract – Breaches of 2013-2020 Restricted Stock Unit Agreements)

64.     LKQ repeats and re-alleges the allegations contained in Paragraphs 1 through 63, above, as if set forth fully herein.

65.     LKQ and Rutledge entered into various Restricted Stock Unit Agreements during the period of 2011-2020, which, among other things, govern the granting and vesting of restricted LKQ stock to Rutledge under the Company's equity incentive program.

66.     The RSU Agreements attached hereto at Exhibits A-H are valid and binding agreements.

67.     Rutledge received good and valuable consideration for entering into the RSU Agreements, including the right to receive LKQ stock under the terms set forth in the RSU Agreements.

68.     Rutledge entered into, assented, and agreed to be bound by the RSU Agreements and the parties performed under the RSU Agreements, including, among other things, the granting, vesting, and exercising of restricted stock units in accordance with the terms and conditions of the RSU Agreements.

69.     LKQ has fully performed under the RSU Agreements and has performed any and all conditions precedent to the enforcement of the terms of the RSU Agreements.

70.     Rutledge's agreement to be bound by and comply with the terms and conditions in Section 16 of the 2013-2015 RSU Agreements and Section 17 of the 2016-2020 RSU Agreements was a material inducement for LKQ to enter into the RSU Agreements.

71.     Rutledge's compliance with the terms and conditions in Section 16 of the 2013-2015 RSU Agreements and Section 17 of the 2016-2020 RSU Agreements was an express condition to the granting and vesting of restricted stock under the RSU Agreements.

72. Rutledge voluntarily resigned his employment with and separated his service to LKQ on April 14, 2021. After Rutledge's employment with LKQ ended, and in May of 2021, LKQ learned that Rutledge had begun a new position with Fenix Auto Parts.

73. Fenix Auto Parts is a national recycler and reseller of original equipment manufacturer and salvage automotive products in the United States.

74. Fenix Parts is a direct competitor of LKQ in the original equipment manufacturer and salvage automotive products marketplace – including in the markets of Lake City, Florida, Northern Florida, and through its many locations throughout the United States.

75. Rutledge is engaged in managerial, sales, and marketing activities that are substantially similar to the activities that he performed as a Plant Manager for LKQ, relating to the sale and distribution of products that are directly competitive with those that he managed, sold, serviced, and marketed on behalf of LKQ.

76. Rutledge's conduct is in breach of the RSU Agreements, including under the terms and conditions set forth in Section 16 of the 2013-2015 RSU Agreements and Section 17 of the 2016-2020 RSU Agreements.

77. Specifically, Rutledge's competitive employment and conduct on behalf of Fenix Auto Parts constitutes separate and independent breaches of the 2013 RSU Agreement; the 2014 RSU Agreement; the 2015 RSU Agreement; the 2016 RSU Agreement; the 2017 RSU Agreement; the 2018 RSU Agreement; the 2019 RSU Agreement; and the 2020 RSU Agreement.

78. Rutledge's breaches of the RSU Agreements have directly and proximately caused Plaintiffs to suffer damages, including, but not limited to, damages to Plaintiffs' customer goodwill, customer relationships, loss of business, and the granting of valuable restricted stock based on false or fraudulent pretenses and conduct in direct violation of the RSU Agreements.

16

79.     Pursuant to the RSU Agreements, LKQ is entitled to any proceeds received by Rutledge for the sale of shares granted under the RSU Agreements based on Rutledge's breaches of the terms and conditions in Section 16 of the 2013-2015 RSU Agreements and Section 17 of the 2016-2020 RSU Agreements.

80.     In accordance with the RSU Agreements, Rutledge's forfeiture is effective as of the dates of his breach of the restrictive covenants contained in the respective RSU Agreements.  If the shares of stock provided under the RSU Agreements have been sold by Rutledge, he is obligated to immediately pay LKQ the proceeds of any such sale.

81.     Rutledge's violations of his restrictive covenant agreements and obligations to LKQ have caused damages to LKQ, including to its customer and employee relationships, good will, confidential information, among other damages.

82.     Rutledge's actions are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of LKQ.

83.     But for an exercise of the equitable powers of this Court, LKQ will be irreparably injured and harmed by Rutledge's continuing breaches of the RSU Agreements and the sale of restricted stock to which he is not contractually entitled.

84.     LKQ requests that the Court enter judgment on Count I in its favor and against Rutledge, and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

**COUNT II**
**(Breach of Contract – Breaches of 2013-2020 Confidentiality,**
**Non-Competition and Non-Solicitation Agreements)**

85.     LKQ repeats and re-alleges the allegations contained in Paragraphs 1 through 84, above, as if set forth fully herein.

17

86.     LKQ and Rutledge entered into various Confidentiality, Non-Competition, and Non-Solicitation Agreements during the period of 2011 through 2020 (the "Restrictive Covenant Agreements")

87.     The Restrictive Covenant Agreements attached hereto at Exhibits I-R are valid and binding agreements.

88.     Rutledge received good and valuable consideration for entering into the Restrictive Covenant Agreements, including his continued employment and compensation for his Plant Manager position and ability to obtain the benefits provided under the RSU Agreements.

89.     Rutledge entered into, assented, and agreed to be bound by the Restrictive Covenant Agreements.

90.     LKQ performed any and all conditions precedent to the enforcement of the terms of the Restrictive Covenant Agreements.

91.     Rutledge's agreement to be bound by and comply with the terms and conditions in the Restrictive Covenant Agreements was a material inducement for LKQ to enter into the RSU Agreements as is expressly contemplated by the Restrictive Covenant Agreements.

92.     Rutledge voluntarily resigned his employment with and separated his service to LKQ on April 14, 2021.  After Rutledge's employment with LKQ ended, and in May of 2021, LKQ learned that Rutledge had begun a new position with Fenix Auto Parts.

93.     Fenix Auto Parts is a national recycler and reseller of original equipment manufacturer and salvage automotive products in the United States.

94.     Fenix Parts is a direct competitor of LKQ in the original equipment manufacturer and salvage automotive products marketplace – including in markets of Lake City, Florida, Northern Florida, and through its many locations throughout the United States.

FP 40691524.1

95. Rutledge is engaged in managerial, sales, and marketing activities that are substantially similar to the activities that he performed as a Plant Manager for LKQ relating to the sale and distribution of products that are directly competitive with those that he managed, sold, serviced, and marketed on behalf of LKQ.

96. Upon information and belief, Rutledge is engaging in competitive conduct at Fenix Auto Parts' corporate headquarters in Texas, at his residence in Lake City, Florida, and at and for the benefit of Fenix Auto Parts' facility in Jacksonville, Florida.

97. Rutledge's employment with Fenix Auto Parts and competitive conduct is in breach of the Non-Competition Covenants set forth in Section 2 of the respective Restrictive Covenant Agreements and is being conducted within the restricted durational period of 9 months and 75-mile restricted geographic area.

98. Specifically, Rutledge's conduct in performing competitive conduct on behalf of Fenix Auto Parts constitutes breaches of the 2011 Restrictive Covenant Agreement; the 2012 Restrictive Covenant Agreement; the 2013 Restrictive Covenant Agreement; the 2014 Restrictive Covenant Agreement; the 2015 Restrictive Covenant Agreement; the 2016 Restrictive Covenant Agreement; the 2017 Restrictive Covenant Agreement; the 2018 Restrictive Covenant Agreement; the 2019 RSU Agreement; and the 2020 RSU Agreement.

99. Upon information and belief, Rutledge has disclosed, or inevitably will disclose in performing his job duties on behalf of LKQ's direct competitor, LKQ's confidential and proprietary business information, including, but not limited to, information relating to customer contracts, contacts, pricing, financial information and gross margins, and customer-related data, to unlawfully compete with LKQ in violation of his non-disclosure of confidential information covenants in the Restrictive Covenant Agreements.

100.     Rutledge's breaches of the Restrictive Covenant Agreement have directly and proximately caused LKQ to suffer damages, including, but not limited to, damages to LKQ's customer goodwill, customer relationships, and the payment of valuable restricted stock units under false or fraudulent pretenses or based on conduct in direct violation of the RSU Agreements and Restrictive Covenant Agreements.

101.     Pursuant to the RSU Agreements, LKQ is also entitled to any proceeds received by Rutledge from the sale of stock granted under the RSU Agreements based on Rutledge's breaches of the terms and conditions of the Restrictive Covenant Agreements.

102.     Rutledge's actions are willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of LKQ.

103.     But for an exercise of the equitable powers of this Court, LKQ will be irreparably injured and harmed by Rutledge's continuing breaches of the Restrictive Covenant Agreements.

104.     LKQ requests that the Court enter judgment on Count II in its favor and against Rutledge, and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

## COUNT III
### (Unjust Enrichment)

105.     LKQ repeats and re-alleges the allegations contained in Paragraphs 1 through 104, above, as if set forth fully herein.

106.     As a result of his misconduct, Rutledge has been unjustly enriched, to LKQ's detriment, through the granting and sale of restricted stock under LKQ's incentive compensation plan.

107.     Rutledge's conduct as described herein constitutes circumstances wherein it would be manifestly unjust, grossly unfair, and unconscionable to allow Rutledge to retain any benefit or

profit generated from his sale of the stock that was granted to him under LKQ's equity incentive compensation plan.

108.    LKQ requests that the Court enter judgment on Count III in its favor and against Rutledge, and award the equitable and legal remedies sought in the Prayer for Relief in this Complaint, and any other relief the Court deems equitable and just.

**COUNT IV**
**(Preliminary and Permanent Injunctive Relief)**

109.    LKQ repeats and re-alleges the allegations contained in Paragraphs 1 through 108 above, as if set forth fully herein.

110.    Based on the above facts and as further pled in Counts I-III of the Complaint, LKQ is likely to succeed on the merits of its claims against Rutledge.

111.    LKQ will be irreparably harmed without the issuance of an injunction due to the actions of Rutledge as described herein.

112.    LKQ has no adequate remedy at law for the loss or threatened loss of highly valuable confidential information, customer goodwill and relationships, and the sale of equity grants that were acquired through false pretenses and conduct in breach of the RSU Agreements; thus, injunctive relief is appropriate.

113.    The balance of harms tips in favor of issuing an injunction for LKQ's benefit and protection.

114.    LKQ is entitled to injunctive relief as set forth in the Prayer for Relief.

**REQUESTS FOR RELIEF**

WHEREFORE, LKQ requests that this Court:

A.    Enter a preliminary and then a permanent injunction, restraining and enjoining Rutledge, whether directly or indirectly, alone or in concert with other persons or corporate entities

until further Order of this Court, from:

1. using, disclosing, or transmitting to any individual or entity, for any purpose, the following confidential information from LKQ: (a) information regarding LKQ's financial performance, metrics, revenue, business forecasting, business development plans or strategic planning, and information constituting or concerning LKQ's arrangements, plans, strategies, negotiations, discussions and/or communications relating to its customers; (b) information constituting or concerning LKQ's corporate operations, including its sales personnel; and (c) information constituting or concerning LKQ's pricing, sales initiatives and techniques, customer relationships, or any other proprietary or trade secret information;

2. engaging in any employment or competitive conduct prohibited under the Non-Competition Covenants in Section 2 of the 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, and 2020 Restrictive Covenant Agreements entered into between LKQ and Rutledge, or otherwise engaging in any conduct prohibited under the non-solicitation of customers, non-solicitation of employees, or non-disclosure of confidential information covenants in the Restrictive Covenant Agreements;

3. exercising, selling, or otherwise disposing of any LKQ stock obtained under or arising out of the terms and conditions of the 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, and 2020 RSU Agreements entered into between LKQ and Rutledge.

B.    Enter judgment on Counts I, II, and II of the Complaint in favor of LKQ, and order Rutledge to repay LKQ for the full amount of any proceeds obtained based on the sale or disposition of LKQ stock obtained under or arising out of the RSU Agreements.

C.    Enter judgment on all Counts of the Complaint in favor of LKQ, and order Rutledge to pay all damages allowable by law to LKQ including, without limitation, all damages caused by Rutledge's unlawful competition in violation of his agreements with LKQ; compensatory and consequential damages to LKQ in an amount to be determined at trial; an award in favor of LKQ for its costs and attorneys' fees associated with this action; an award of punitive damages to LKQ in an amount to be determined at trial; any such other and further legal and equitable relief as the Court deems appropriate or just.

Dated:  June 4, 2021                    Respectfully submitted,


                              By:    /s/ Craig R. Annunziata
                                     One of the Attorneys for Plaintiff,
                                     LKQ Corporation

Craig R. Annunziata
cannunziata@fisherphillips.com
James M. Hux, Jr.
jhux@fisherphillips.com
FISHER & PHILLIPS, LLP
10 S. Wacker Drive, Suite 3450
Chicago, IL 60606
(312) 346-8061 (TEL)
(312) 346-3179 (FAX)