**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LKQ CORPORATION, | |
| Plaintiff/Counter-Defendant, | No. 21 C 03022 |
| v. | Judge Thomas M. Durkin |
| ROBERT RUTLEDGE, | |
| Defendant/Counter-Claimant. | |

**MEMORANDUM OPINION AND ORDER**

In this case, Plaintiff LKQ Corp. ("LKQ") claims that Robert Rutledge ("Rutledge"), a former employee, violated the non-competition provisions contained in two sets of contracts by working for a competitor. Rutledge counterclaimed for unpaid wages, arguing that he is owed a *pro rata* share of Restricted Stock Units from the first few months of 2021 before he left LKQ. Now before the Court are the parties' cross motions for summary judgment. *LKQ Corp. v. Rutledge*, 21 C 3022 ("R."), ECF Nos. 77, 80. For the following reasons, Rutledge's motion is granted and denied in part, and LKQ's motion is granted and denied in part.

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there

1

is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

LKQ is the nation's largest "supplier of salvaged and recycled automobile parts." R. 79 ¶ 1. Rutledge's entire career has been in the auto salvage and recycling industry. *Id.* ¶ 6. Rutledge started working for LKQ as the Plant Manager of LKQ's Lake City, Florida location in October 2009 when LKQ acquired Rutledge's prior employer, another auto salvage and recycling company. *Id.* ¶¶ 2, 4–5. Rutledge's duties as a Plant Manager for LKQ included, but were not limited to, "overseeing all departments at the facility, overseeing the daily operations of the plant from selling and delivering parts to local customers, and hiring and firing facility employees." *Id.* ¶ 8. He oversaw the Lake City facility's revenue and growth and therefore had access to revenue figures and customer lists and contact information. *Id.* ¶ 9; R. 80-2 ¶13–14. There is some dispute over whether Rutledge was responsible for customer service

or sales, but he at least had access to sales data, interacted with LKQ customers, and managed employees who worked in sales. R. 79 ¶ 10; R. 80-2 ¶ 10; R. 85 ¶ 10.

As part of his employment, LKQ offered Rutledge the ability to receive LKQ Restricted Stock Units ("RSUs"). R. 79 ¶ 15; R. 80-2 ¶¶ 19–20. Each year, Rutledge would receive an enumerated number of shares of LKQ stock based on a vesting schedule, whereby 10% of the stocks vested every six months, on January 14 and July 14 each year. R. 25-8 ("2020 RSUA") at 1; R. 79 ¶ 15; R. 85 ¶ 17. Once the RSUs vested, Rutledge could then opt to sell them on the open market. R. 79 ¶ 15; R. 85 ¶ 17.

In order to receive the RSUs, Rutledge entered into Restricted Stock Unit Agreements ("RSUAs") with LKQ every year from 2013 to 2020. R. 79 ¶ 12; R. 80-2 ¶ 19. The RSUAs contain a section titled, "Non-Competition and Confidentiality," (the "RSUA Non-Compete") which states that Rutledge may not "directly or indirectly [ ] be employed by, engage or have any interest in any business which is or becomes competitive with [LKQ] or its Subsidiaries" for nine months after the termination of Rutledge's employment with LKQ. 2020 RSUA at 5; R. 79 ¶ 13. If Rutledge breached this provision, the RSUs, the shares underlying the RSUs, and any proceeds received by Rutledge from selling the shares "shall be forfeited . . . to [LKQ] without any consideration therefore." 2020 RSUA at 4. The RSUAs also specified that vesting was "subject to [Rutledge]'s continued Service through the applicable vesting date," and that, upon termination of Rutledge's employment, all unvested RSUs would be forfeited to LKQ. *Id.* at 1–2. The parties dispute how many shares of LKQ restricted

3

stock Rutledge received during his employment with LKQ, as well as the market value of those shares,[1] but agree that Rutledge sold all RSUs that he received. R. 80-2 ¶¶ 31-32; R. 84 ¶¶ 31–32.

Rutledge also signed "Confidentiality, Non-Competition, and Non-Solicitation Agreement[s]" (the "RC Agreements") every year from 2011 to 2020. R. 25-18 ("2020 RC Agreement") at 1; R. 79 ¶ 19. The RC Agreements prohibited Rutledge from "caus[ing], engag[ing] in, represent[ing], furnish[ing] consulting services to, be[ing] employed by or hav[ing] any interest in . . . any business that would be competitive with any business conducted by [LKQ] or its subsidiaries" within 75 miles of any LKQ facility where Rutledge worked, for nine months following the termination of his employment (the "RC Agreement Non-Compete"). 2020 RC Agreement at 2; R. 79 ¶ 19. The RC Agreements stated:

> Employee desires to receive a grant of an equity incentive award from Employer . . . and desires to be employed by (or to continue employment with) Employer . . . in a position in which Employee may receive from Employer or develop for Employer information that Employer desires to keep secret and confidential.

> Employer's desire to keep this information secret and confidential is based on Employer's knowledge that doing so fosters and enhances Employer's competitive advantage in the marketplace for its products and services.

2020 RC Agreement at 1.

---

[1] LKQ claims that Rutledge received 11,414 shares worth a market value of $317,507 and received $639,925 from their sale, which it hopes to claw back. R. 80-2 ¶ 31–32. Rutledge claims that he received 5,146 shares with a market value of $162,651. R. 84 ¶¶ 31–32. Rutledge further explains that LKQ's figures include the sale of unrelated stock options prior to 2013 that were not conditioned on the RSUAs, and that the RSUs he sold to cover his tax liabilities should not be counted. *Id.* ¶ 32.

The RSUAs and RC Agreements also contained non-solicitation and non-disclosure of confidential information ("non-disclosure") clauses. R. 79 ¶ 21. LKQ's corporate representative testified that, through these agreements, it sought to protect "specific customer pricing, customer discounts, customer contact information, . . . vendor and supplier pricing, any potential rebates, . . . financial information, revenue, margin data, expense data, profitability data, . . . [and] any marketing strategies for Rutledge's market," but admitted that there are other employees with access to this information who are not subject to such restrictive covenants. *Id.* ¶¶ 25, 27; R. 85 ¶ 27; R. 79-2 (Robert Six Dep. Tr.) at 97–98.

On March 23, 2021, Rutledge announced his resignation from LKQ; April 14, 2021 was his last day. R. 79 ¶¶ 29–30. Rutledge began working for Fenix Auto Parts ("Fenix"), another auto salvage and recycling business and direct competitor of LKQ, within a week. *Id.* ¶ 32; R. 80-2 ¶¶ 34–35. Rutledge started at Fenix as Vice President of Capital Projects.[2] R. 80-2 ¶ 43. In this position, Rutledge worked at his home (which was within 75 miles of LKQ's Lake City facility) approximately 50% of the time; otherwise, he did not work for any Fenix facility within the 75-mile radius.[3] R. 79 ¶¶ 34–35. His primary job responsibilities included purchasing, maintaining,

---

[2] There is some conflicting testimony that his official title was Vice President of Capital Procurement or Vice President of Capital Procurement and Projects. R. 79 ¶ 33; R. 85 ¶ 33. This dispute is immaterial.

[3] LKQ attempts to dispute this fact by pointing to Rutledge's testimony that he visited one time the Fenix HR building in Jacksonville, Florida, which was within the 75-mile radius. R. 85 at ¶ 36; R. 79-1 (Rutledge Dep. Tr.) at 163–64. But Rutledge testified that he did no work for this facility, and LKQ has pointed to no evidence which disputes this testimony. R. 79-1 at 163–64

5

constructing, and overseeing large assets outside of normal inventory, such as fleet vehicles. *Id.* ¶¶ 37–38; R. 85 ¶ 37. One year after he started at Fenix, Rutledge's job shifted to Area Director, a position in which he supervises the general managers of various Fenix facilities in North Carolina and Florida and spends about half of his time working from home. R. 79 ¶¶ 39–42.

It is uncontested that, despite an investigation by LKQ, LKQ has uncovered no direct evidence that Rutledge solicited any LKQ customers or employees or absconded with any LKQ confidential business information or documents upon his departure from LKQ. *Id.* ¶¶ 48–51. Rutledge admits that, in his current position, he uses his general background and knowledge from his time in the auto salvage and recycling industry, including his time at LKQ. *Id.* ¶ 46. LKQ contends that Rutledge's employment with Fenix hurts its vendor, supplier, and customer relationships. *Id.* ¶ 47.

LKQ therefore sued Rutledge, claiming breaches of the RSUAs and RC Agreements, seeking the forfeiture of Rutledge's proceeds from selling the RSUs from 2013 to present, and requesting injunctive relief prohibiting Rutledge from using LKQ's confidential information, selling LKQ stock, and further breaching the RSUAs. R. 25. Rutledge counterclaimed, contending that he was never paid the *pro rata* share of the RSUs that he had earned from January 2021 to April 2021, when he left LKQ. He claims he is owed 131 LKQ shares, which are worth about $55 a share. R. 79 ¶¶ 58–60. LKQ admits it did not pay him the RSUs, but instead argues that he is not owed the RSUs because the RSUs were not vested. R. 85 ¶¶ 58–60.

Now before the Court is each party's motion for summary judgment. LKQ moves for summary judgment on its claim that Rutledge breached the RSUAs and on Rutledge's claim for unpaid wages. Rutledge moves for summary judgment that the RSUAs and RC Agreements are invalid and unenforceable restraints on trade, that the RC Agreements are unsupported by consideration, and that LKQ has no evidence that he breached the RC Agreements. He also argues there is insufficient evidence to support any claim that he breached the non-solicitation and non-disclosure restrictive covenants and that LKQ's request for injunctive relief is moot. Finally, he seeks summary judgment on his claim for unpaid wages.

The Court will address each argument in turn, starting first with the validity of each Agreement's non-competition provisions.

## Discussion

### I.   The RSUA Non-Competes

Rutledge first argues that the RSUA Non-Competes are post-employment restrictive covenants that are invalid and unenforceable restraints on trade, and the Court should therefore enter summary judgment in Rutledge's favor on Count I. Meanwhile, LKQ moves for summary judgment on Count I, arguing that the undisputed facts show that Rutledge breached the RSUAs.

According to LKQ, the RSUA Non-Compete clauses are not post-employment restrictive covenants, but rather "forfeiture" or "claw back" provisions. *See, e.g.*, *Tatom v. Ameritech Corp.*, 305 F.3d 737, 744 (7th Cir. 2002) ("Federal cases draw a distinction between provisions that prevent an employee from working for a

7

competitor and those that call for a forfeiture of certain benefits should he do so."). LKQ is right—the RSUAs do not outright prevent Rutledge from competitive conduct; instead, they state that if Rutledge is "employed by . . . any business which is or becomes competitive with [LKQ] or its subsidiaries" within nine months following his separation from LKQ, LKQ may claw back the proceeds he received from the sale of the RSUs.

But even so, under Delaware law (which governs the RSUAs),[4] forfeiture and claw back provisions are subject to the same reasonableness inquiry as other post-employment restrictive covenants. *Ainslie v. Cantor Fitzgerald*, No. 9436-VCZ, 2023 WL 106924, at *24 (Del. Ct. Chan. Jan. 4, 2023). A non-competition agreement is reasonable only if it: (1) is "reasonable" in temporal and geographic scope; (2) protects a legitimate business interest of the employer; and (3) "survives a balancing of the equities." *FP UC Holdings, LLC v. Hamilton*, No. 2019-1029-JRS, 2020 WL 1492783, at *6 (Del. Ct. Chan. Mar. 27, 2020). When weighing the equities, the Court focuses on whether the non-competition clause is "essential for the protection of the employer's economic interests," and weighs this interest against the employee's interests. *Id.* The Court will not enforce a provision if doing so "would impose an unusual hardship on a former employee." *Id.* (citing *Norton Petroleum Corp. v. Cameron*, No. CIV.A. 15212-NC, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998)). There must also "be a reasonable relationship between the value of the benefits passing to the corporation [via the promise not to compete] and the value of the [stock

---

[4] *See* R. 58 at 4–6 (ruling that Delaware law applies to the RSUAs).

options granted." *W.R. Berkley Corp. v. Dunai*, No. 1:19-cv-01223, 2021 WL 1751347, at *2 (D. Del. May 4, 2021) (quoting *Beard v. Elster*, 160 A.2d 731, 737 (Del. 1960)). When applying this balancing test, "the court should take notice of the consideration an employee received in exchange for her promise not to compete before determining whether the non-compete is reasonable." *Hamilton*, 2020 WL 1492783, at *6.

In exchange for his agreement to comply with the RSUAs, Rutledge received RSUs valued between $130,000 and $340,000 over eight to ten years[5] (the parties dispute the market value of the stock he received with respect to the RSUs). And LKQ claims (though Rutledge disputes) that Rutledge received proceeds of over $640,000 in selling those RSUs. His annual salary at LKQ was $109,000, and his salary at Fenix is $139,000. R. 80-2 at ¶¶ 16, 47. LKQ argues, therefore, that the RSUs provided Rutledge a windfall for the small price of promising not to work for any LKQ competitor for nine months following separation. But divided over the time that Rutledge worked at LKQ, the stock benefits provided Rutledge with moderate additional compensation per year, not a huge all-at-once windfall. And the forfeiture provision, which seeks the return of the total amount of proceeds over the entirety of Rutledge's employment, is untethered from LKQ's interests in protecting its confidential information and vendor or customer relationships.

For example, in *Ainslie*, a company sought to enforce a provision which required a partner to forfeit his entitlement to large amounts of future compensation

---

[5] The RSUAs govern eight years, between 2013 and 2021. Rutledge claims that LKQ's calculations take into account RSUs he received over ten years, from 2011 to 2021. R. 84-1 at ¶ 11.

if he performed any work for any competing business for one year. 2022 WL 18107003, at *16. The court there, holding that forfeiture provisions are not entitled to deference, likened the clause at issue to a liquidated damages provision, which is disfavored in Delaware. *Id.* at *24. In other words, because the amount of money the former partner would have to forfeit under the provision for any competitive conduct was "not tethered to any competition that actually harms [the employer]," it served as a punishment for breaching the contract. *Id.* at *23. And because such a liquidated damages provision "[i]s exercised without heed to whether the employee's actions had actually harmed the former employer, it would create the same undue chilling effect on employment and upward mobility as a restrictive covenant[,] . . . has an unlawful *in terrorem* purpose and effect, and is unenforceable because the restraint . . . is not reasonable." *Id.* at *23 (cleaned up) (quoting *Faw, Casson & Co., LLP v. Halpen*, No. CIV.A 00C-01-015, 2001 WL 985104, at *2–3 (Del. Sup. Ct. Aug. 7, 2001)). The *Ainslie* court further found the lack of geographic scope and ban on any employment with any business competitive with the employer or its affiliates unreasonable. *Id.* at *17.

LKQ argues that *Ainslie* is inapplicable because it involved a condition precedent to future compensation rather than a claw back. LKQ also points to different Delaware case law where courts have refused to draw such a parallel between forfeiture/claw back provisions and liquidated damages provisions. *See W.R. Berkley Corp. v. Hall*, No. 03C-12-146WCC, 2005 WL 406348, at *5 (Del. Super. Ct. Feb. 16, 2005). But the RSUA Non-Competes are even closer to liquidated damages provisions than the forfeiture provision in *Ainslie*. Rather than limiting Rutledge's

10

ability to receive future compensation from LKQ or requiring him to return stock options, it requires him to give LKQ all the proceeds he received in selling the RSUs over the course of eight years—in an amount LKQ contends is nearly five times his current annual salary. These financial consequences are detrimental to Rutledge and unrelated to LKQ's loss. Indeed, LKQ admitted that it has no direct evidence that Rutledge solicited any LKQ customer or employee or absconded with LKQ confidential information. And even if he did, the proceeds Rutledge received in selling his RSUs have nothing to do with any loss that LKQ could suffer by a former middle-management employee working for a competitor. LKQ does not explain how Rutledge, in his position for Fenix overseeing large capital projects unrelated to normal car part inventory,[6] has hurt LKQ's customer, vendor, or supplier relationships. And, in seeking the proceeds (i.e., profit) on the sale of the RSUs, rather than the initial market value of the RSUs or any of the stock itself, the RSUA Non-Competes become further unmoored from any argument that LKQ is attempting to prevent a gift of corporate assets or ensure its stock owners' interests are aligned with the company's.

And like the provision that was found to be unenforceable in *Ainslie*, the RSUA Non-Competes bar an employee from working in *any* position for *any* company that is prejudicial to or in conflict with LKQ or its subsidiaries without geographic limitation. Rutledge argues that he would be barred from even working as a janitor at Fenix. Though hyperbolic, the Court sees no language in the RSUA Non-Competes

---

[6] Rutledge's subsequent position as Area Manager for Fenix is irrelevant because he started it in April 2022, which is outside the nine-month restriction period.

that makes Rutledge's argument inaccurate. Rutledge, who has spent the entirety of his professional life in the auto salvage and recycling industry, is therefore totally barred from seeking a living in the only industry he has ever known for nine months or must pay, according to LKQ, over $640,000. This is certainly the type of provision which acts more as a punishment than a protection of LKQ's interests. It has an "unlawful *in terrorem* effect" on a mid-level managerial employee and therefore operates as an unreasonable restraint on trade. *Ainslie*, 2023 WL 106924, at *23.

LKQ cites several cases which have upheld forfeiture provisions, but they are distinguishable. First, LKQ's cases were decided under the arbitrary and capricious standard, rather than the reasonableness standard, because the courts were reviewing administrative committee decisions. *Hall*, 2005 WL 406348, at *2 ("[W]hen a stock option committee is vested with final, binding and conclusive authority to determine a participant's right to receive or retain benefits, that decision made in accordance with the provisions of the agreement will not be second guessed by the Court absent a showing of fraud or bad faith."); *see also JPMorgan Chase & Co. v. Pierce*, 517 F. Supp. 2d 954, 962–64 (E.D. Mich. 2007) (administrative committee's decision to claw back former officer's stock gains was not made in bad faith).

Second, the forfeiture provisions in those cases placed less of an undue burden on the employee and were more comparable to the losses the companies suffered by the employee's breaches. For example, the provisions sought forfeitures of the stocks themselves or their "granted value" rather than the employee's total "proceeds." *Dunai*, 2021 WL 1751347, at *2 ("[S]he had to forfeit the stock or repay the granted

12

value. . . . And if the stock price had gone up between the grant and the repayment, she could . . . still come out ahead. Nothing about that is unreasonable."); *Hall*, 2005 WL 406348, at *2 (employee only had to forfeit the proceeds gained on stock options exercised within six months after termination). Some required forfeiture for benefits received over a much shorter period before the breach, rather than the entirety of the stock issued over the course of the employment (here, eight years' worth). *Pierce*, 517 F. Supp. 2d at 957 (provision required repayment of proceeds received on stock options exercised one year prior to termination); *Hall*, 2005 WL 406348, at *2 (company sought reimbursement for six months' worth of stock options). These cases also involved narrower non-compete language aimed at very high-level employees, such as corporate vice presidents, rather than middle-management employees. *Dunai*, 2021 WL 1751347, at *1 (corporate vice president); *Pierce*, 517 F. Supp. 2d at 956 (senior vice president prohibited from "perform[ing] the same or substantially similar functions" for a competitor); *Hall*, 2005 WL 406348, at *2 (senior vice president who was one of the top three employees in the company). In other words, unlike this case, the forfeitures sought in LKQ's cited cases were reasonable because they were commensurate with the actual losses suffered by the companies due to competitive action by high-level employees.

Because the RSU Non-Competes are unenforceable, the Court need not reach LKQ's argument that Rutledge breached their terms. Rutledge's motion for summary judgment on LKQ's breach of the RSUAs count is granted, and LKQ's motion on the same count is denied.

## II.     The RC Agreement Non-Competes

The Court turns next to the RC Agreement Non-Competes. Unlike the RSUA Non-Competes, the RC Agreement Non-Competes are traditional post-employment restrictive covenants. They prohibit Rutledge from being employed, in any capacity, "by any business that would be competitive with any business conducted by [LKQ] or its subsidiaries" within a 75-mile radius of the Lake City facility where Rutledge worked for nine months post-employment. 2020 RC Agreement at 2. Rutledge argues that this, too, is an unenforceable restraint on trade under Illinois law.[7] He further argues that it lacks consideration, and that there is insufficient evidence that he breached it. The Court finds that the RC Agreement is also an invalid and unenforceable restraint on trade under the totality of the circumstances.

In Illinois, "courts favor fair competition and disfavor restraints of trade[,] [and] noncompetition clauses are closely scrutinized." *Bishop v. Lakeland Animal Hosp., P.C.*, 268 Ill. App. 3d 114, 117 (1994). Like Delaware, Illinois applies a test asking whether a post-employment restrictive covenant not to compete is "reasonably necessary to protect the interests of the employer" to determine whether it is enforceable. *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 716 (N.D. Ill. 2014) (quoting *McRand, Inc. v. Van Beelen*, 138 Ill. App. 3d 1045, 1051 (1985)). Whether an employer maintains a legitimate business interest in a non-compete clause is just one factor of reasonableness to be decided under the totality of the circumstances. *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 403 (Ill. 2011).

---

[7] Illinois law governs the RC Agreements. *See* R. 58 at 9.

This determination may include considerations such as the permanence of customer relationships and the employee's acquisition of confidential information. *Id.*

The employer's interest in the restrictive covenant is then measured against "its hardship to the defendant, its effect upon the general public, and the reasonableness of the time, territory, and activity restrictions." *Miessen*, 998 F. Supp. 2d at 716–17 (citing *McRand*, 138 Ill. App. 3d at 1051). Restrictions on activities "should be narrowly tailored to protect only against activities that threaten the employer's interest." *Lawrence & Allen, Inc. v. Cambridge Human Resource Grp., Inc.,* 292 Ill. App. 3d 131, 140 (1997).

Rutledge first contends that LKQ does not have a legitimate business interest in enforcing the RC Agreements. LKQ alleges that Rutledge had access to LKQ's confidential information, such as its customer lists, and financial information like revenue figures, sales data, pricing, and profitability. And, by working in his initial position at Fenix, LKQ contends that Rutledge harmed its vendor, supplier, and customer relationships. Rutledge maintains that LKQ's interests are protected by the non-solicitation and non-disclosure covenants in the RC Agreements, and LKQ has cited no direct evidence that he harmed LKQ's vendor, supplier, or customer relationships or misappropriated any confidential information.

First, it is unclear how a former Plant Manager working for a competitor would injure LKQ's vendor or supplier relationships, and LKQ does not offer any explanation. LKQ does not allege that Rutledge contacting LKQ's suppliers would somehow injure it, such as by causing its suppliers to stop servicing LKQ or to raise

their prices. This Court was also unable to find a single Illinois case that recognized the protection of supplier and vendor relationships as a legitimate business interest under a non-compete. *See Unisource Worldside, Inc. v. Carrara*, 244 F. Supp. 2d 977, 986 (C.D. Ill. 2003) (identities of suppliers were not proprietary information to support legitimate business interest). LKQ also cites no evidence that Rutledge, in his position as Vice President for Capital Projects for Fenix, had any authority to solicit customers or use the confidential information he gained from his employment at LKQ, as he testified that he uses his own general knowledge he gained during his time in the industry. Finally, LKQ admits that there are employees with access to the same information as Rutledge who are not required to enter such non-competition contracts. But even if the Court assumes that the protection of LKQ's confidential information and vendor, supplier, and customer relationships are legitimate business interests, the RC Agreement Non-Competes go well beyond protecting these interests into overbreadth.

Though the RC Agreements contain a geographic limitation that does not exist in the RSU Non-Competes, the provisions are nonetheless unreasonable. To begin, Illinois courts have upheld restrictive covenants with geographic limitations that align with the employer's interests. For example, a non-compete provision which banned a radio talk show host from engaging in similar employment with another radio station within 100 miles was reasonable because it left open many positions in the broadcasting industry, and 100 miles was the geographic radius of a strong radio station signal. *Midwest Tel., Inc. v. Oloffson*, 298 Ill. App. 3d 548, 557 (1998). And a

16

ten-mile geographic restriction that was coextensive with where the employer did business was similarly aligned to protecting the employer's interests. *Prairie Eye Ctr., Ltd. v. Butler*, 329 Ill. App. 3d 293, 297–98 (2002). But when a geographic limitation is arbitrary and not related to the protection of the employer's interests, it weighs against a finding of reasonableness. *See Medix Staffing Solutions, Inc. v. Dumrauf*, No. 17 C 6648, 2018 WL 1859039, at *3 (N.D. Ill. April 17, 2018) (50-mile geographic limitation unreasonable because it was unrelated to the employer's area of service); *see also McNicholl Counseling, P.C. v. Jenkins*, 2023 IL App (5th) 220732-U, at ¶¶ 37–39 (same). Seventy-five miles is a large geographic limitation, but not extremely restrictive, given that LKQ has a national reach. But LKQ does not explain why a 75-mile sphere of protection around Lake City, Florida is reasonably necessary to the protection of its interests. It does not allege, for example, that any of its customers are within that radius.

But most concerning is the total ban on employment with any business that is competitive with LKQ or its subsidiaries. Like the RSUA Non-Competes, the RC Agreement Non-Competes contain a blanket ban on all activities for competitors. Illinois courts and federal courts applying Illinois law have found similar contracts unenforceable, even when the contracts contained geographic and temporal limitations. *See Dumrauf*, 2018 WL 1859039, at *3 (non-compete barring any employment by competitor or potential competitor in any capacity within 50 miles is unenforceable); *Miessen*, 998 F. Supp. 2d at 717 (non-compete which prohibited "engaging in any business substantially related to the business" of the employer was

17

overbroad); *Hay Grp., Inc. v. Bassick*, No. 02 C 8194, 2005 WL 2420415, at *3 (N.D. Ill. Sept. 29, 2005) (non-compete which was a total restraint on the employee's ability to engage in his occupation invalid); *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 452 (2007) (finding a non-compete which barred the employee from "pursuing work with" any business competitive with employer or its affiliates in any capacity to be "patently overbroad"); *Eichmann v. Nat'l Hosp. and Health Care Servs., Inc.*, 308 Ill. App. 3d 337 (1999) (Illinois courts are "hesitant to enforce noncompetition agreements that prohibit employees from soliciting or servicing not only customers with whom they had direct contact, but also customers they never solicited or had contact with while employed."). Non-competes that are upheld are generally limited to the employee conducting similar work for competitors. *See, e.g.*, *Oloffson*, 298 Ill. App. 3d at 557; *Butler*, 329 Ill. App. 3d at 297–98.

The non-compete here is a total bar on Rutledge working for any competitor of LKQ or its subsidiaries in any position, despite the limited arenas in which Rutledge's knowledge or contacts would be useful to a competitor. As discussed above, even if he worked as a janitor for Fenix, he would still be violating the terms of the contract, though no interest of LKQ would be harmed. And again, there is no direct evidence that Rutledge has actually harmed LKQ's interests, misappropriated confidential information, or solicited any of LKQ's customers during the nine month limitations period. Indeed, Rutledge's position as Vice President of Capital Projects involved managing large, capital assets, not contacting car part suppliers or customers or conducting pricing, customer service, sales, or financial tasks. In sum, because the

RC Agreement Non-Competes are also overbroad, they are unenforceable against Rutledge, and the Court need not address the remainder of Rutledge's arguments.[8] His motion for summary judgment is therefore granted as to Count II.

## III. Non-Solicitation and Non-Disclosure Restrictive Covenants

Rutledge next argues that, to the extent LKQ is seeking to assert that Rutledge violated the non-solicitation and non-disclosure covenants, LKQ lacks proof to support these claims. LKQ stated in its opposition brief that it is not seeking to enforce the non-solicitation covenant. R. 83 at 13 n.4. But its brief is silent on whether it seeks to enforce the non-disclosure covenant. Though it is unclear if LKQ is seeking to assert this claim, it cannot establish that Rutledge violated the non-disclosure clause. LKQ, which has the burden of proof, admits that it has no direct evidence that Rutledge absconded with or is misappropriating its confidential information. It is appropriate to grant summary judgment when the party with the burden of proof lacks the ability to establish an essential element of its case. *Celotex*, 477 U.S. at 322–23. Therefore, to the extent LKQ is seeking to enforce the non-disclosure restrictive covenant, summary judgment in favor of Rutledge is granted. Rutledge's motion as to the non-solicitation covenant is denied as moot.

## IV. Claim for Injunctive Relief

---

[8] LKQ asks that the Court "blue pencil" or modify the agreements if the Court finds them to be overbroad. But the Court will not do so because "as the Illinois Appellate Court and courts in this District have recognized, modifying an extremely overbroad non-compete agreement could provide a disincentive for employers and employees to draft narrow and precise agreements." *Triumph Packaging Grp. v. Ward*, 834 F. Supp. 2d 796, 815 (N.D. Ill. 2011).

Rutledge also seeks summary judgment on LKQ's claim for injunctive relief. In Count IV of its Amended Complaint, LKQ seeks to enjoin Rutledge from disclosing confidential information, engaging in competitive conduct under the RSUA Non-Competes and RC Agreement Non-Competes, and exercising or selling RSUs. R. 25 at pp. 20–22. First and foremost, LKQ cannot seek to enforce an unenforceable non-compete provision. *Hanchett Paper Co. v. Melchiorre*, 341 Ill. App. 3d 345, 351 (2003) ("The propriety of injunctive relief based on a covenant not to compete depends on the enforceability of that covenant," (internal citations omitted)). And because there is no evidence that Rutledge has violated the non-disclosure covenants, LKQ will not be irreparably harmed absent the issuance of an injunction. Finally, LKQ's requests are moot because (1) the nine-month enforcement period in the RSUAs and RC Agreements expired; and (2) Rutledge does not own any RSUs. Therefore, Rutledge's motion for summary judgment on Count IV is granted.

## V.    Rutledge's Claim for Lost Wages

Finally, each side moves for summary judgment on Rutledge's claim for lost wages. Rutledge alleges that he is owed a *pro rata* share of the RSUs he "earned" from January to April 2021. According to Rutledge, LKQ owes him 131 shares of LKQ restricted stock for that period. LKQ admits that it did not pay Rutledge any RSUs from that period, but instead alleges that these RSUs were unvested at the time he left LKQ, and that, under the RSUAs, Rutledge has no claim to them. The RSUAs provide that a portion of the RSUs vest on a six-month schedule every January 14 and July 14, "subject to [Rutledge]'s continued Service through the applicable vesting

date . . . ." 2020 RSUA at 1.[9] Rutledge was to forfeit any unvested RSUs upon termination of employment. *Id.* at 2.

First, Rutledge does not have a contractual right to the RSUs he is seeking. The RSUAs are clear that the RSUs vest on specific dates every six months, in January and July. There is no dispute that the RSUs Rutledge is seeking were unvested as of the date he left LKQ—they were scheduled to vest in July 2021. Under the RSUAs, it is a condition precedent to receive RSUs that the employee remains employed by LKQ "*through the applicable vesting date.*" 2020 RSUA at 1 (emphasis added). Rutledge did not; he left LKQ in April 2021. Upon termination of employment, Rutledge's future rights to unvested RSUs were forfeited to LKQ.

Rutledge claims that the RSUs were part of his wages and compensation that he earned, and he therefore has a statutory right to them under *Regan v. BP Prods. N. Am.*, No. 1:17-cv-09208, 2020 WL 127954, at *4–5 (N.D. Ill. Jan. 10, 2020), which applied the Illinois Wage Payment and Collections Act ("IWPCA"). But the RSUAs are dictated by Delaware law, not Illinois law. And even so, the IWPCA applies only to employees who work in Illinois. *Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1174–75 (N.D. Ill. 2016), *aff'd*, 843 F.3d 660 (7th Cir. 2016). Rutledge provides no evidence that he worked in Illinois at any time. Even so, *Ragan* is distinguishable because the court there found that RSUs were an "earned" bonus under the IWCPA

---

[9] The RSUAs have a severability provision. 2020 RSUA at 3 ("In the event that any part of this Agreement shall be held to be invalid or unenforceable, the remaining parts hereof shall nevertheless continue to be valid and enforceable."). The Court's finding that the RSUA Non-Competes are unenforceable does not affect the enforceability of the remainder of the RSUAs.

so long as the employee had complied with the contractual conditions precedent to the receipt of the RSUs. 2020 WL 127954, at *4. The court found that the employee had met those contractual conditions—in that case, he work for the employer for a certain amount of time. *Id.* But here, Rutledge does not meet the contractual conditions laid out in the RSUAs because RSUAs require that, to receive any RSU, Rutledge must be employed by LKQ as of the vesting date. *See, e.g.*, *McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 541 (2009) (finding plaintiff was not entitled to a *pro rata* share of a bonus prior to termination where the conditions precedent to receiving the bonus were not met); *see also Tatom v. Ameritech Corp.*, No. 99 C 683, 2000 WL 1648931, at *8–9 (N.D. Ill. Sept. 28, 2000), *aff'd* 305 F.3d 737 (7th Cir. 2002) (conditional stock options were not wages or earned bonuses such that employee had right to *pro rata* share under the IWCPA).[10] Therefore, on Rutledge's counterclaim for unpaid wages, LKQ's motion for summary judgment is granted and Rutledge's motion for summary judgment is denied.

## CONCLUSION

---

[10] In his motion for summary judgment and briefs responding to LKQ's arguments, Rutledge provides no other legal basis supporting his right to the unvested RSUs, though his complaint makes claims in the alternative under Illinois, Delaware, and Florida law. Even if he had argued under Delaware or Florida law, the outcome would be the same. *See vMedex, Inc. v. TDS Operating, Inc.*, No. 18-1662, 2021 WL 1737298, at *9 (D. Del. May 3, 2021) (dismissing a breach of contract claim that a former employer failed to pay unvested RSUs because the contract provided for the forfeiture of unvested RSUs if the employee was not employed on the date for vesting); *Lincare Holdings Inc. v. Ford*, 307 So. 3d 905, 910 (Fla. Dist. Ct. App. 2020) (finding that an employee's already "earned" commission was forfeitable at termination because the employment contract provided for such a forfeiture).

For the foregoing reasons, Rutledge's motion for summary judgment (R. 77) is granted as to Counts I, II, and IV,[11] and denied as to his counterclaim for unpaid wages. LKQ's motion for summary judgment (R. 80) is granted as to Rutledge's counterclaim for unpaid wages and denied as to Count I. As there are no outstanding claims in this matter, judgment shall enter, with each party bearing its own costs.

.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: June 13, 2023

---

[11] This Court dismissed Count III when it granted in part Rutledge's motion to dismiss. R. 58.

23